BRANDON J. HARRISON, Judge
A Pulaski County jury convicted Michael Duvall, Jr., on two counts of rape, both against his daughter K.D. He was sentenced to a total of sixty years' imprisonment; the terms to run consecutively. He argues that the circuit court erred in admitting the testimony of three witnesses under the pedophile exception to Arkansas Rule of Evidence 404(b) and that the State did not properly authenticate text messages it used against him as evidence. We affirm.
I. Overview
Pretrial. In August 2016, the State filed a felony criminal information charging Duvall with two counts of rape in violation of Ark. Code Ann. § 5-14-103 (Supp. 2017). The State alleged that Duvall engaged in sexual intercourse or deviate sexual activity with K.D., a minor less than fourteen years of age, on or about 1 January 2002 through 31 December 2010. The second count alleged that Duvall engaged in sexual intercourse or deviate sexual activity as a guardian of K.D. on or about 1 March 2013 through 30 June 2013 when she was less than eighteen-years-old.[1]
In March 2017, the State filed several notices of its intent to use Rule 404(b) evidence and sought a pretrial ruling that the testimony of L.A., T.D., and T.G. would be admissible under the pedophile exception. It argued that evidence of Duvall's prior acts of sexual misconduct would be admissible to show his motive, intent, preparation, plan, knowledge, absence of mistake, and any other relevant purpose. The State said that L.A. would testify that in 1999 or 2000, when she was a minor residing in the same household as Duvall, he showed her pornography and requested she take her clothes off and allow him to look at her naked body. It also alleged that L.A. performed oral sex on Duvall several times over the course of a month. The State also stated that T.D. is Duvall's biological daughter and that she would testify that Duvall would often walk around naked and that in 2015 he requested that she take off her underwear and show him her vagina over the FaceTime feature on her iPhone. The proposed testimony of the third witness, twenty-one-year-old T.G., was that when she was ten to twelve-years-old, Duvall walked around naked in her presence and showed her a pornographic movie. The State also said she would testify that Duvall walked in on her once while she was showering and touched her breast and buttocks.
Duvall filed multiple objections to the "late filed" Rule 404(b) notices and asked *109 the court to exclude each of the three witnesses' testimony for many rule-based and constitutional reasons. During a pretrial hearing on 13 March 2017, the circuit court stated that it did not need to hear from the three witnesses, that the State could use their testimony, and that Duvall could cross-examine them and "make proper objections at the time of their testimony." The court also overruled Duvall's detailed arguments, objections, and motions related to the State's Rule 404(b) evidence.
II. Trial Testimony
K.D.'s Testimony. K.D., Duvall's daughter and the victim in this case, was twenty years old at the time of the trial. She testified that she lived primarily in North Little Rock with her mother growing up but would visit Duvall on the weekends when he lived in the area. She told the jury that when she was approximately four-years-old and staying with her father, he came downstairs without any clothes on and asked if she wanted a peanut butter and jelly sandwich. K.D. said she wanted a jelly sandwich, and her father lay on the floor and put jelly on his penis and told her to lick it off. K.D. did so but said that he pushed her head forcefully.
K.D. said it was normal for her father to walk around naked and that he would shower with her when she was a child. She also described events when her father made her stand naked in front of a mirror while he would ejaculate on her, or she would masturbate him. Duvall moved to Connecticut when K.D. was around 11-years-old but would visit her in Arkansas. During those visits, she said that she would stay in hotels with her father where he would immediately take off his clothes and masturbate. She would also visit him in Connecticut where he performed oral sex on her.
She testified that Duvall gave her a cellphone when she was in eighth grade. He asked her to send him pictures, FaceTimed her when she was getting in the bathtub, and would sometimes tell her to do certain acts. She visited Duvall after he had moved from Connecticut to Georgia when she was fourteen-years-old. She said that he tried to insert his penis in her vagina, that she told him it hurt, and he moved off of her. She gave him massages while he was naked during that visit.
K.D. also described a visit Duvall made to North Little Rock when she was sixteen-years old. She said that her father picked her up from school and that they went to his hotel. He told her to take her clothes off, face the television so he could masturbate, and then inserted his finger into her vagina as he performed oral sex.
T.D.'s Testimony. Seventeen-year-old T.D. testified that she is Duvall's biological daughter but has a different mother than K.D. She said that she would stay with Duvall in hotels, and he would walk around naked all the time. From the time she was ten-years-old until she was sixteen, he would have her take off her top or bottoms to see how she was "developing" after taking her swimming at the hotel. T.D. testified that Duvall obtained and paid for her cellphone. She complied with Duvall's request to see her vagina over FaceTime. When she visited Duvall in Connecticut, he walked in the room when she was taking a bath.
L.A.'s Testimony. L.A. testified that she is Duvall's former sister-in-law, that he lived with her, her sister, and her mother when L.A. was fourteen-years-old, which was approximately seventeen years ago. She described Duvall's asking her if she was a virgin and if she knew "what to do" if she had a boyfriend. He showed her a video of her sister performing oral sex on him and asked if he could teach her how.
*110 She said yes, and he asked what her favorite type of jelly was and then put strawberry jelly on his penis. He complimented her that she was "better than [her] sister," and L.A. said that she had given him oral sex about twenty times during the short time he had lived at the house. He warned her not to tell anyone because he would end up in the penitentiary.
T.G.'s Testimony. K.D.'s twenty-one-year-old cousin, T.G., testified that she and K.D. were around the same age and spent a lot of time together when she was eleven or twelve-years-old. She said that Duvall always walked around naked and that the first time she went to his house, he was naked and watching pornography and asked her to "ejaculate him." She refused and walked on his back instead. She also said that Duvall walked in while she and K.D. showered, joined them, and washed them with a washcloth. She said that Duvall gave her and K.D. money to not say anything.
III. The Pedophile Exception
Our supreme court outlined the pedophile exception in Hortenberry v. State , 2017 Ark. 261, 526 S.W.3d 840 :
Rule 404(b) states that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
The first sentence provides the general rule excluding evidence of a defendant's prior bad acts, while the second sentence provides an exemplary, but not exhaustive, list of exceptions to that rule. We have explained that evidence is not admissible under Rule 404(b) simply to establish that the defendant is a bad person who does bad things. Rule 404(b) permits the introduction of evidence of prior bad acts if the evidence is independently relevant to make the existence of any fact of consequence more or less probable than it would be without the evidence.
Additionally, this court has recognized a separate "pedophile exception" to the general rule that evidence of a defendant's prior bad acts cannot be used to prove that the defendant committed the charged crime.
The pedophile exception allows the State to introduce evidence of a defendant's similar acts with the same or other children when it is helpful in showing a proclivity for a specific act with the person or class of persons with whom the defendant has an intimate relationship. The rationale for this exception is that such evidence helps to prove the depraved sexual instinct of the accused. There are two requirements for this exception to apply: (1) a sufficient degree of similarity between the evidence to be introduced and the charged sexual conduct, and (2) evidence of an "intimate relationship" between the defendant and the victim of the prior act.
Even if evidence is admissible under a bad-acts exception, the evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Thus, a circuit court may refuse to admit evidence that is unfairly prejudicial to the defendant, even if it might be relevant.
Finally, we have held that a circuit court has broad discretion in deciding evidentiary issues, and its decision will not be reversed absent an abuse of discretion. The abuse-of-discretion standard is a high threshold that does not simply require error in the circuit court's decision, but requires that the *111 circuit court act improvidently, thoughtlessly, or without due consideration.
Hortenberry , 2017 Ark. 261 at 9-10, 526 S.W.3d at 846-47 (internal citations omitted).
A. Rule 404(b) Arguments
Duvall argues that the circuit court committed reversible error when it allowed T.D., L.A., and T.G. to testify because no exception to Rule 404(b) applied. He maintains that those allegations were too dissimilar to the rapes that the State alleged he committed against K.D. and that even if the witnesses' accounts of past sexual abuse were sufficiently like the rape allegations, their probative value was substantially outweighed by the danger of unfair prejudice. He does not argue a lack of evidence of an "intimate relationship" between the witnesses and Duvall. The State responds that the circuit court did not abuse its discretion in admitting the three witnesses' testimony and that, in the alternative, any error in admitting their testimony was harmless.
1. T.D.'s testimony
T.D.'s testimony at trial established a sufficient degree of similarity with the rape accusations made in this case. We reject Duvall's contention that because T.D. did not testify that he touched her, the encounters were too dissimilar to fall under the pedophile exception. The exception's reason for being is to allow evidence that helps prove the depraved sexual instinct of the accused. Flanery v. State , 362 Ark. 311, 208 S.W.3d 187 (2005). In this case, T.D.'s testimony that her father looked at her naked body when she stayed at hotels with him as a child and that he provided a cellphone and asked his daughter to act out sexually while using FaceTime is similar enough to K.D.'s testimony that she also stayed with her father alone in hotels, that he looked at her naked body, that he gave her a cellphone, and that he would ask her to act out sexually using FaceTime. The admission of this evidence helped to show that Duvall's impulses and behavior were far outside the expected range of a normal father, to understate the point. The circuit court did not abuse its discretion when it admitted the challenged testimony under the pedophile exception.
2. L.A.'s testimony
Duvall argues that the encounters that L.A. testified about were too remote in time for the pedophile exception to apply. Recall that she testified about events that happened seventeen years ago with Duvall when she was fourteen-years-old. The passage of time, alone, does not determine the admission of evidence under the pedophile exception. Tull v. State , 82 Ark. App. 159, 164, 119 S.W.3d 523, 526 (2003). No abuse of discretion occurred by admitting L.A.'s testimony; her testimony was independently relevant to the unique signature and methods Duvall used to plan his assaults.
K.D. testified that the first sexual encounter she remembered having with Duvall was when he put jelly on his penis and had her lick it off. Although occurring at a later age (fourteen, not four), L.A. had a remarkably similar first encounter in which Duvall placed strawberry jelly on his penis and instructed her on what to do. K.D.'s testimony and L.A.'s testimony showed similarities in that Duvall had the proclivity to lure and sexually violate young girls in his company, that he made efforts to be alone with them, that he showed sexually explicit videos, and that he had a planned method for obtaining oral sex from minor children. It suffices to state that we have considered Duvall's point carefully but reject his argument that the circuit court erred by allowing L.A. to testify.
*112 3. T.G.'s testimony
Duvall argues that because T.G. never claimed that he touched her, her testimony was too dissimilar to what K.D. alleged he did for the pedophile exception to apply. He cites Akins v. State , 330 Ark. 228, 955 S.W.2d 483 (1997) to support his argument. In Akins , our supreme court addressed whether two rapes were similar enough to support a finding that a prior adult rape victim's testimony should have been allowed. Id. But that was not the holding of the case; it was merely a teaching point that "had a proper objection been made, the evidence should have been excluded." Id. at 235, 955 S.W.2d at 487. Moreover, Akins is not a pedophile-exception case and does not control the outcome here.
We affirm the admission of T.G.'s testimony. She, too, described Duvall walking around naked and showing her and K.D. pornography. Her account of Duvall asking her to "ejaculate" him or massage his back by walking on it is very similar to K.D.'s testimony that Duvall would have her rub his penis or give him massages. The similarities in Duvall's conduct towards K.D. and T.G., who were of very similar ages-ten to 11-years-old-demonstrated a depraved sexual instinct. Kelley v. State , 2009 Ark. 389, 327 S.W.3d 373 (concluding that there was a sufficient degree of similarity between the evidence to be introduced and the charged sexual conduct when both the witness and the victim, who were around the same age when the alleged abuse occurred, testified about Kelley's sexual conduct and stated that he showed them pornographic movies).
IV. Rule 403 arguments
Duvall also makes a catchall Rule 403 argument. "Even if this Court concludes that Mr. Duvall's alleged prior bad acts with respect to [T.D.], [L.A.], and [T.G.] are sufficiently similar to the charges that the State brought against him in this case, allegations of rape, particularly rape of young girls or young women, are so inflammatory and conscience shocking that it is a certainty that substantial prejudice will take root." Arkansas Rule of Evidence 403 states that although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
We do not reach Duvall's Arkansas Rule of Evidence 403 arguments because there is not a clear ruling by the circuit court on whether the probative value of each witness's testimony to the State's case substantially outweighed the danger of unfair prejudice to him. An appellant must obtain a ruling on whether Rule 404(b) evidence should have been excluded under Rule 403 to preserve the issue for an appeal. Hubbard v. State , 2017 Ark. App. 93, at 9, n.5, 513 S.W.3d 289, 295 n.5. See also Cluck v. State , 365 Ark. 166, 175, 226 S.W.3d 780, 787 (2006) (circuit court must conduct a probative versus prejudicial weighing with respect to evidence if the defense considers the weighing to be important or legally required in order to preserve the Rule 403 issues for an appeal). Duvall failed to obtain a ruling on the Rule 403 arguments he presents here, so we will not address them.
V. Authentication of Text Messages
Duvall argues that some text messages were admitted as evidence against him but were not properly authenticated. Some more background is needed to place this issue in context.
A. How the Text Messages Were Admitted During Trial
The authenticity of some text messages first arose while North Little Rock police *113 detective Ashley Noel testified. Detective Noel interviewed K.D. about the allegations she had made against her father. The detective testified that she was given some text messages and photos during her interview with K.D. in July 2016. She said that K.D. signed a consent to search an electronic device (cellular phone), and the detective photographed text-message exchanges between K.D. and Duvall. Those photographs were first introduced as State's exhibits one through nine during Detective Noel's testimony.
Detective Noel also testified that the phone number she (K.D.) had listed for Duvall was the same number that he later gave to Detective Noel. According to the detective, Duvall gave her his number on 23 August 2016. She agreed that she had verified that the number on the challenged text messages was Duvall's phone number. Here is the substantive part of Duvall's objections:[2]
These photos have not been properly authenticated. The witness has testified that because she had a phone number and that she had access to [K.D's] phone those documents have not been proven to be the actual text messages themselves. The State could've easily gotten the provider to provide a copy of the true text messages. Those messages could have been altered.... Those documents haven't been properly authenticated. If they are alleging that my client sent that, my client will have to go and testify say, yes, the texts were from him. Also too [sic] those are just photo images or just screen shots. You could easily modify those text messages which we can later prove if my client takes the stand, the State could have easily gotten a warrant to actually issue to the provider to get the true text message from the provider, what is AT & T, Southwestern Bell, whomever. But just to take a screen shot and say this is a text message from my client, that is not proper authentication.
After some discussion between the attorneys and the court, the text messages were not admitted. On cross-examination, Detective Noel admitted that she "believed" but did not "know" that Duvall had sent the text messages and had "no proof" that he did.
K.D. testified briefly about the text messages before they were accepted by the circuit court as evidence. She said that before she reported her father, she tried to talk to him by text messaging. She "wanted him to understand what he did" but still wanted a relationship with him. She agreed that the texts were sent to a number she knew to be his; she had labeled the number as "Padre." K.D. said that she did not believe Duvall let other people use his phone. She agreed that when she was texting these messages to the phone number that she knew to be her dad, someone was replying to her messages. She also said that State's exhibits one through seven were accurate pictures of the text messages that she sent to her father's number.
Exhibits one through seven were admitted over Duvall's renewed objection. Exhibits eight and nine were also admitted over his objection. K.D. said exhibits eight and nine accurately depicted the photographs that were on her phone that she sent to the number she saved as "Padre, Michael Duvall."
B. Argument on Appeal
Duvall argues that the circuit court abused its discretion when it allowed pictures *114 of the text messages into evidence because the State could not prove that he "actually sent" them. The State counters that sufficient circumstantial evidence exists to reliably tie Duvall to the text messages K.D. received.
Duvall relies on a Pennsylvania case, Commonwealth v. Koch , 39 A.3d 996 (Pa. Super. Ct. 2011) for the proposition that authenticating text messages requires more than confirming that the telephone number belongs to a particular person; instead, there must be evidence that the text messages contain factual information unique to the parties involved because more than one person can use a phone to send text messages. The State tries to distinguish the Koch case, arguing that a Pennsylvania state court decision does not control in Arkansas. True enough, but the bigger problem is that the case the parties tussle over has been vacated by the Pennsylvania Supreme Court on review. See Commonwealth v. Koch , 630 Pa. 374, 106 A.3d 705 (2014). The Pennsylvania Supreme Court ended up affirming the admission of text messages under some unique facts involving accomplice liability. Id. at 714. We have not, strictly speaking, applied Koch in any party's favor in this case.
A document must be authenticated before it can be admitted as evidence. Davis v. State , 350 Ark. 22, 39, 86 S.W.3d 872, 883 (2002). A rule of evidence provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Ark. R. Evid. 901(a) (2017). Rule 901 further provides that the testimony of a witness with knowledge that a matter is what it is claimed to be is sufficient to authenticate evidence and also that appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances, can be used to authenticate evidence. Ark. R. Evid. 901(b)(1) & (4). We review the authentication of text messages like any other evidence-for an abuse of discretion-and do not reverse absent a showing of prejudice. Gulley v. State , 2012 Ark. 368, at 10, 423 S.W.3d 569, 576.
The main thrust of the authentication requirement is to sufficiently ensure that the proposed evidence is, in fact, what the proponent claims it to be. To this end, our supreme court has required "sufficient circumstantial evidence" to "corroborate the identity of the sender" of the text messages; in other words, there must be some indicia of authorship. Id. at 15 n.4, 423 S.W.3d at 579 n.4 ; see also Steele v. Lyon , 2015 Ark. App. 251, at 11, 460 S.W.3d 827, 835 (Harrison, J., concurring) ("[A] proper foundation for the introduction of electronically recorded material should include who is communicating what to whom."). This is admittedly a developing (and important) area of the law in this electronic age. See Koch , 106 A.3d at 721 (Eaton, J., dissenting in part and concurring in part) ("The possibility that a person other than [appellee] was the author of the drug-related text messages went ... to the weight of the evidence rather than admissibility of the messages.").
In Gulley , our supreme court held that three text messages were properly authenticated. Gulley , 2012 Ark. 368, at 13, 423 S.W.3d at 578. For example, it reasoned that one of the text messages came from a cellular telephone number assigned to Gulley-together with witness testimony that Gulley was dropped off at the victim's apartment the night that she was killed, and given the context and content of the message-met the authentication requirements of Rule 901. Id. at 14, 423 S.W.3d at 579. As in Gulley , the State here presented sufficient corroborating evidence that the *115 text messages were what the State claimed them to be: communicative exchanges between Duvall and K.D. on a legally relevant issue.
There was testimony that the telephone number that K.D. sent the messages to, and from which messages were sent to her, was Duvall's cellphone number. K.D. said that the texts were exchanged after she talked with the police and reached out to Duvall and that Duvall did not let someone else use his phone. Detective Noel testified that she took photos from K.D.'s phone with K.D.'s permission. The detective also said that text messages received by K.D. came from a cellphone number assigned to Duvall. The same cellphone number was saved as "Padre, Michael Duvall" in K.D.'s phone. Moreover, K.D. testified that she sent the messages to her father at that number to try to "understand" and to still have a relationship. The content of the controverted text messages suggested that Duvall did (or could have) sent them. And no direct proof in this case undermined the messages' authenticity. Given this record, the thrust of Duvall's challenge goes to the weight the jury could have placed on the challenged text messages, not their admissibility. The circuit court did not abuse its discretion when it overruled Duvall's authentication challenge and admitted the text messages as evidence.
Last, Duvall argues that the text messages were inadmissible hearsay. Because he did not raise the hearsay objection to the circuit court, we will not address it. Marshall v. State , 2017 Ark. 347, at 5, 532 S.W.3d 563, 566.
Affirmed.
Gruber, C.J., and Glover, J., agree.

The State amended some of the wording and dates in the later documents it filed, but those differences are immaterial.

Duvall moved before the trial to exclude the texts and objected for lack of authentication along the way. We have only included one example of his objections.