Cite as 2022 Ark. App. 464

# ARKANSAS COURT OF APPEALS
DIVISION II
**No.** CR-22-182

| | | |
|---|---|---|
| JAMES TAYLOR | | **Opinion Delivered** November 16, 2022 |
| | APPELLANT | |
| | | APPEAL FROM THE MILLER COUNTY CIRCUIT COURT [NO. 46CR-21-13] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE CARLTON D. JONES, JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

**BRANDON J. HARRISON, Chief Judge**

James Taylor was convicted after a Miller County jury decided that, as a prior felon, he unlawfully possessed a firearm. It was his ninth felony conviction, and second felon-in-possession conviction. Taylor was sentenced to 360 months for possessing the firearm as a habitual offender. He argues here that there was insufficient evidence of constructive possession. Taylor also argues that the circuit court should have allowed him to introduce text messages of the more personal kind that a sheriff's deputy for nearby Nevada County sent to his (Taylor's) girlfriend Brandi Johnson. We affirm.

## I. *Background*

Since Appellant Taylor's February 2000 conviction for felonious possession of methamphetamine paraphernalia, it has been illegal for him to "own or possess any firearm." Ark. Code Ann. § 5-73-103(a)(1). He learned about that law no later than 19 July 2018, when he pleaded guilty to breaking it. Taylor was on parole, and under a 72-month

suspended sentence for three convictions that day, on 4 January 2021, when more trouble knocked on Taylor's door. Specifically, January 4 is the day when Adam Wilson and Brandon Emerson with the Special Response Team for Arkansas Community Correction arrived at a house on Miller County Road 105 (near Texarkana) to serve appellant Taylor with an arrest warrant. There begins this story in earnest.

Taylor lived at the home where the officers went to serve the warrant. Law enforcement knew to look for Taylor at the County Road 105 house because Taylor had reported it as his residence to his parole officer since April 2019. Taylor did not, however, own the house. Intent on serving the warrant, Officers Wilson and Emerson pulled up to the house just behind another car. The driver of that car was named Nicky. She told the officers that she was at the house to get a debit card from her mother, Brandi Johnson. At the time, Ms. Johnson was Taylor's girlfriend. Officer Wilson asked Nicky to tell Ms. Johnson that law enforcement was outside. Ms. Johnson didn't respond to her daughter Nicky's calls or texts. About this time, Officer Wilson heard movement inside the home, but no one responded to knocks or requests to answer the door. So the officers entered through an unlocked door.

Once inside the house, officers found Taylor and Ms. Johnson inside a bedroom that had been padlocked from the inside; it was the only room in the home that appeared lived-in. Taylor came out, at the officers' request, and was arrested. Officer Wilson would eventually find in that room a loaded .22 magnum rifle with a sawed-off stock and nine live .22 magnum rounds. But he did not find the contraband when Taylor was first taken into

custody. The record reveals that the officers took a "quick look" around when they first seized Taylor but did not search the room until later.

We know that Taylor was serving a suspended sentence when the officers engaged Taylor at the County Road 105 home, but why did law enforcement serve a warrant on Taylor on January 4? The pretrial proceedings disclose that Taylor was suspected of committing Rape, Ark. Code Ann. § 5-14-103, and Introduction of Controlled Substance Into Body of Another Person, Ark. Code Ann. § 5-13-210. That appears to be why law enforcement went to the house where Taylor lived. And Miller County detective Cody Hensley had learned from a forensic interviewer that an alleged victim said that Taylor had possessed a gun—specifically, a shotgun.

Returning to post-arrest activities, as Officer Wilson was en route to the jail with Taylor in custody, he called Detective Hensley to inform him of Taylor's arrest. Detective Hensley told Officer Wilson to go back to the house where Taylor was seized and look for a firearm. Officer Wilson turned around (with Taylor still in the backseat) and went back to the house.

Enter Bill Varner, who leased the house where Taylor lived when he was arrested. Varner had also employed Taylor on a neighboring farm. At some point during these events, Varner sent three other farmhands to retrieve a farm-owned Suburban that was parked at the scene. The farmhands arrived at the home as Officer Wilson and company left the first time. And the farmhands were still there when Officer Wilson returned with Taylor to look for a gun at Detective Hensley's behest. When Officer Wilson asked Taylor if he

3

would find a gun in the home, Taylor said no. Officer Wilson left Taylor in the car with Officer Emerson while he went back into the house.

Away from prying ears, Officer Wilson asked Ms. Johnson, who had remained at the home, the same question. Based on information from her, the officer found a loaded .22 magnum rifle with a sawed-off stock in the room Ms. Johnson and Taylor were in when law enforcement arrived to serve the warrant and entered the house. The rifle was in a closet-like area of that room, "hidden" and "disguised" in a box whose bottom you couldn't see, with men's clothes pulled over it. In a drawer, Officer Wilson found "a large mass" of ammunition of various calibers, including nine .22 magnum rounds. He brought the rifle and ammunition back to the truck where Taylor and Officer Emerson were waiting and secured them in the cab.

In a post-arrest interview, Detective Hensley asked Taylor about the gun. Taylor admitted he had known about the gun, and "stated it had been there for umpteen years."

Michael Cheatham, one of the farmhands who retrieved Varner's Suburban, an event we mentioned already, testified at trial. Cheatham had worked for Varner, and known Taylor, for six years. He confirmed that Taylor had lived at the house on County Road 105. Cheatham also testified that he had seen Taylor with the gun Officer Wilson retrieved from the house on nights when Taylor would go hog hunting on the neighboring farm. Cheatham recalled the gun as a sawed off or pump shotgun. Sometimes, though, he said Taylor would come over with a gun that looked like a .22 with a scope on it.[1]

---

[1]Whether a shotgun, another .22 rifle, or this .22 rifle, it would have been unlawful for Taylor to possess a firearm in the time Cheatham testified he had known him.

4

Taylor moved for a directed verdict at the close of the State's evidence, arguing there was insufficient evidence that he constructively possessed a firearm. The circuit court noted the potential discrepancy in Cheatham's testimony about the gun he had seen Taylor possess, but ruled that "whether he is talking about the firearm that is presently in evidence" was a question for the jury.

Taylor called one witness in defense: his girlfriend, Ms. Johnson, who said that, within five minutes of Taylor's arrest, she received a call on her cell phone from Steve Otwell, a deputy with the Nevada (not Miller) County Sheriff's Department. Ms. Johnson, who lives in Nevada County, knew Deputy Otwell and had reached out to him shortly before these events for help with a personal matter. Since then, she testified, Deputy Otwell had been reaching out regularly, entreating her to come to his house for dinner, drinks, or sex. Taylor's counsel questioned Ms. Johnson about what she testified were screenshots from her phone of text messages since November 2020 between Deputy Otwell and her. She testified they fairly and accurately depicted what was said. When counsel moved to introduce them, the State objected:

PROSECUTOR: Your Honor, they appear to be photocopies of text messages between her and Steve Otwell. They are irrelevant. They are hearsay. They have not been authenticated and therefore I object to their introduction.

DEFENSE COUNSEL: Your Honor, they are relevant and we are working on hooking, connecting that up. They have been identified as screen shots taken from her phone. They are, been identified as a fair and accurate representation of screen shots taken from her phone. Now the jury can give whatever weight they want to that evidence, but that does not exclude them as hearsay.

5

After the circuit court excused the jury and the witness, Taylor's counsel explained that the text messages were not being offered to prove the truth of the contents, and that continued examination of Brandi Johnson would show that Nevada County Deputy Otwell had engaged Miller County Deputy Hensley in a conspiracy to subject Taylor to a felon-in-possession charge. The circuit court allowed counsel to voir dire Ms. Johnson about the messages and the anticipated context her testimony would provide to demonstrate their relevance and value to the jury.

Outside the jury's presence, Ms. Johnson identified the seized rifle as her grandfather's. She produced what she testified was the original stock, which had broken off because she dropped the gun. She took the gun to Taylor's house the night before his arrest, she said, because Deputy Otwell had advised that "there was going to be a series of events taking place," but Taylor wouldn't get in any serious trouble. Ms. Johnson said she had put the gun in the top of the closet, but panicked when officers were handcuffing Taylor and moved it to the bottom of the closet, hoping they wouldn't find it.

The court excluded the text messages:

> Okay. All right. The text messages are out for any number of reasons. Number one, I don't find them to be relevant. Number two, there's no date which tells whether they are within the period relevant to this proceeding. Number three, they don't go directly to the defense of this matter. Number four, as to what I stated earlier, the date, you know, that goes to whether or not they are authenticated.

> The Court has also looked at them and actually appears that some of the copies are two different shades. So that gives this Court, you know, significant concerns about those messages, so they are out.

> If you wish to inquire and I think there's been testimony regarding a relationship with Mr. Otwell before the jury, but that would be the extent of where we are on this.

6

After the jury returned, Ms. Johnson repeated her testimony on the points from voir dire, and two more. By this we mean she also testified that Deputy Otwell had some leverage over her because she was in trouble in Nevada County. And when Deputy Otwell called shortly after Taylor's arrest, he asked why she hadn't given officers the gun, and told her they were coming back to get it.

On cross-examination, Ms. Johnson admitted that she loved Taylor, although she was married to someone else. She denied being in a sexual relationship with Deputy Otwell. She admitted she had told the prosecutor's office a different story: farmhand Cheatham had taken the gun from her car the day of Taylor's arrest and put it in the house. And she admitted that, on the day Taylor was arrested, she had told Officer Wilson (who found the rifle) that she had seen a gun in Taylor's closet before. Between the State's objections, Taylor's counsel elicited on redirect that Ms. Johnson had been afraid Deputy Otwell would have her thrown in jail if she did not plant the gun in the house.

At the end, the jury convicted Taylor of unlawfully possessing a firearm, and the circuit entered the judgment and sentencing order that Taylor has appealed.

## II. *Discussion*

### A. Sufficiency of Evidence

Taylor argues first that the circumstantial evidence he possessed the rifle did not "exclude every other reasonable hypothesis than guilt of the accused," *Gill v. State*, 2015 Ark. 421, at 3, 474 S.W.3d 77, 79, because he did not own the home, Ms. Johnson was with him in the room where the gun was found, and the gun was discovered outside his

immediate proximity after he was removed from the home. Further, Taylor notes, Ms. Johnson told the jury that she moved the gun without his knowledge.

Constructive possession—the control or right to control contraband—is sufficient to prove possession of a firearm. *Davis v. State*, 2019 Ark. App. 463, at 3, 586 S.W.3d 229, 231. The record must include "substantial evidence", which is evidence "forceful enough to compel a conclusion one way or the other without resorting to speculation or conjecture." *Knauls v. State*, 2020 Ark. App. 48, 4, 593 S.W.3d 58, 61. Circumstantial evidence will support a conviction if it is consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id.* Our supreme court has stated:

> Whether [circumstantial] evidence excludes every other hypothesis [than guilt] is left to the jury to decide. The credibility of witnesses is an issue for the jury and not the court. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and … inconsistent evidence.

*Morgan v. State*, 2009 Ark. 257, 7, 308 S.W.3d 147, 152 (citations omitted). Accordingly, when we review the evidence supporting a conviction, we look only at the evidence that supports the jury's verdict, and view it in the light most favorable to the State. *E.g.*, *Cluck v. State*, 365 Ark. 166, 170, 226 S.W.3d 780, 783 (2006).

There is sufficient evidence to support the jury's verdict. When law enforcement arrived at the house where Taylor resided, he and Ms. Johnson were inside a room that was padlocked from the inside. After Taylor and Ms. Johnson emerged from the small room, it was (eventually) searched and a loaded rifle was found in a closet-like area inside the room from which Taylor and Ms. Johnson had reluctantly emerged on law enforcement's repeated commands.

On the rifle that Taylor could not have lawfully possessed as a prior felon, it was "hidden" and "disguised" in a box whose bottom you couldn't see, with men's clothes pulled over it. In a drawer housed in the same small room, Officer Wilson found "a large mass" of ammunition including nine rounds that fit the rifle. Farmhand Cheatham testified, remember, that he had seen Taylor with the gun Officer Wilson retrieved from the house. Officer Wilson secured that gun in the cab of the truck with Taylor. And although Taylor had told Officer Wilson before the search that there would be no gun in the house, he admitted to Detective Hensley in a post-arrest interview that he had known about the gun; it had been there for "umpteen years," said Taylor. What's more, the rifle was loaded when Wilson found it, and Detective Hensley later confirmed it was functional by firing one of the rounds Officer Wilson recovered from the same room.

The main thrust here is that the jury was free to disregard Ms. Johnson's testimony that she had put the rifle in Taylor's closet before his arrest or that she moved it afterward. *Coger v. State*, 2017 Ark. App. 466, at 11, 529 S.W.3d 640, 648 (holding that jury was free to disbelieve girlfriend's testimony that a vial containing drug residue was hers). Ms. Johnson did not claim to have brought the matching ammunition, which tended to tie Taylor to the gun. She admitted having previously told an investigator for the State that someone else (Cheatham) had planted the rifle at a different time.

Construed favorably to the State, the remaining evidence supported scenarios inconsistent with any reasonable hypothesis but Taylor's guilt. Taylor admitted that he knew about the rifle, which was found in a way that could be fairly called "hidden" or "disguised." There was also Taylor's ammunition collection, within the room he occupied

9

when officers from Arkansas Community Correction had announced their presence and knocked and knocked on his door. Whether the rifle was concealed soon before opening the bedroom door for Officer Wilson or long before January 4 arrived, the point is that Taylor's 2018 felon-in-possession conviction should have brought home that the closeted gun was illegal contraband. We affirm the circuit court's decision to deny Taylor's sufficiency challenge at trial.

## B. Text Messages

Taylor also challenges the circuit court's exclusion of a five-page collection of text message screenshots between Ms. Johnson and Deputy Otwell. The circuit courts have broad discretion in deciding evidentiary issues, and a circuit court's ruling will not be disturbed on appeal without a demonstration that the appellant has been prejudiced by an abuse of that discretion. *E.g.*, *Armstrong v. State*, 2020 Ark. 309, at 11, 607 S.W.3d 491, 499. The circuit court's stated reasons for excluding the messages boil down to doubts about their authentication and relevance. We conclude that excluding the text messages was an abuse of the circuit court's discretion albeit, as we will relate, not a prejudicial one in the circumstances. Therefore, no reversible error is presented.

First, authentication of the text messages. The general requirements of authentication and identification under Rule 901 "are satisfied where the trial judge in his discretion is satisfied that the physical evidence presented is genuine and in reasonable probability has not been tampered with." *Davis v. State*, 350 Ark. 22, 39, 86 S.W.3d 872, 883 (2002). People seldom communicate by text message in circumstances that would allow a witness to testify from direct evidence that the purported sender or intended recipient sent

10

or received a particular message. Message contents often are not retained by the mobile carrier. That is one reason why "screenshots" are increasingly presented to courts as evidence of communication on this point or that. *E.g.*, *Rodriguez v. State*, 2014 Ark. App. 660, 449 S.W.3d 306 (rejecting best-evidence challenge to screenshots of since-deleted text messages where AT&T representative testified the company did not retain message contents and recipient testified the screenshots accurately reflected the messages she received). Both this court and the Supreme Court have addressed the requirements for authenticating screenshots, which is a "developing (and important) area of the law in this electronic age[,]" *Duvall v. State*, 2018 Ark. App. 155, at 13, 544 S.W.3d 106, 114. In the typical case, the messages are alleged to have been sent or received by a criminal defendant with a privilege not to testify.

For example, in *Duvall*, we discussed authenticity objections to photographs of a phone screen showing text messages that were purportedly exchanged between a defendant and a daughter he was accused of sexually abusing. *Id.* at 10, 544 S.W.3d at 112–13. The circuit court excluded the messages, on defendant's authenticity objection, when the State sought to introduce them through an investigator who "admitted that she 'believed' but did not 'know' [the defendant] had sent the text messages and had 'no proof' that he did." *Id.* at 11, 544 S.W.3d at 113. The exchanges were admitted later, however, after the daughter described the following:

> She said that before she reported her father, she tried to talk to him by text messaging. She "wanted him to understand what he did" but still wanted a relationship with him. She agreed that the texts were sent to a number she knew to be his; she had labeled the number as "Padre." [She] said that she did not believe Duvall let other people use his phone. She agreed that when she was texting these messages to the phone number that she knew to be her dad, someone was replying

11

to her messages. She also said that State's exhibits one through seven were accurate pictures of the text messages that she sent to her father's number.

*Id.* at 11–12, 544 S.W.3d at 113. We affirmed the circuit court's ruling that the photographs should be admitted, observing that the messages' content "suggested that Duvall did [send] (or could have) sent them" and "no direct proof in this case undermined the messages' authenticity." *Id.* at 14, 544 S.W.3d at 115.

In *Gulley v. State*, the supreme court addressed the authentication of three text messages that had been sent from a prepaid phone, whose contents the State had subpoenaed from the provider. 2012 Ark. 368, at 2–3, 423 S.W.3d at 572–73. Citing Arkansas Rule of Evidence 901, the court discussed each of the screenshots in turn, tying the messages to other testimony that tended to demonstrate that the messages were sent by the defendant himself, the phone's registered owner. *Id.* at 13–15, 423 S.W.3d at 578–79. Even when text messages are harvested from a phone forensically, however, they are not authenticated as messages by the person named in the contact entry if there is no evidence of who had stored the contact or owned the phone, and no other evidence links the name to the stored phone number. *Armstrong*, 2020 Ark. 309, at 13–14, 607 S.W.3d at 500.

Although the point is a close one, the messages in this case were sufficiently authenticated. Ms. Johnson testified that Deputy Otwell, like herself, lived in Nevada County; she had known him from years past and communicated with him about other matters. She had reached out to him in November 2020 "for some assistance with a personal matter," and after that he tried to get her to come to his house. Recall that Deputy Otwell had called Ms. Johnson within five minutes of Taylor's arrest. Why this happened is not clear in the record. Still, Ms. Johnson testified directly that the text-message

12

communications presented to the circuit court as evidence were fair and accurate depictions of her cell phone-based messages with Deputy Otwell.

One screenshot from the proffered-but-excluded collection is in a different format than the others and displays a phone number with an (870) area code beneath the name "Steve Otwell." The messages in that screenshot do not bear a date or time. The other screenshots display the name "Steve Otwell" but no phone number. Three of the pages detail messages (mostly from Deputy Otwell) timestamped on 4 & 5 May 2021. The other two pages list communications over a few hours "Saturday." Which Saturday is anyone's guess.

True, when voir dired, what Ms. Johnson said about the messages' context did not cleanly tie off the connections between the telephone number, the stored contact, and the Steve Otwell she knew. But a couple of messages include legal questions a layperson might ask a law enforcement officer. Deputy Otwell asks in an undated message if Ms. Johnson will be "followed" if she comes over. In another message dated "Saturday," the deputy identifies a sexual desire and indicates Ms. Johnson needs "to figure out how to make it happen without anybody knowing!!" Although some of the deputy's messages seem to respond to intervening messages we don't have, the collected messages share a tone and content such that Brandi Johnson's testimony that Steve Otwell sent them sufficiently authenticated them.

Second, relevancy. The circuit court concluded that the text messages were irrelevant to Taylor's defense because they were not dated, did not appear confined to the period surrounding the arrest, or both. But Taylor's defense was that he did not have

13

"control or the right to control" the rifle that was found inside the closet of a room from which he emerged when confronted by law enforcement. Investigators did not fingerprint the rifle or trace its ownership, and Ms. Johnson was in the room where the rifle was found before, and perhaps after, Taylor's arrest. Ms. Johnson also said on the stand that she had put the rifle in the closet on Deputy Otwell's instructions. So documentation that she had exchanged intimate communications with the deputy—who had known within minutes of Taylor's arrest that no gun had been found—was relevant to that defense.

Although the circuit court abused its discretion by excluding the exhibit, we conclude that the error is slight and therefore harmless. *House v. State*, 2020 Ark. App. 452, at 5, 611 S.W.3d 197, 201. For the reasons set out in the sufficiency analysis above, there was ample evidence that Taylor had constructively possessed the rifle. Recall one piece of that evidence is Taylor's statement to Detective Hensley that he (Taylor) had known about the rifle. And there was Farmhand Cheatham's testimony that he saw Taylor with that rifle.

Although the circuit court erroneously concluded that the text messages between Deputy Otwell and Ms. Johnson were unauthenticated and irrelevant, we agree, for many of the same reasons that gave that court pause, that introducing the messages would not have changed the outcome here. The messages confirm that Deputy Otwell had a personal interest in Ms. Johnson. She testified to the deputy's sexual interest in her, and the prosecution did not attempt to discredit her on that point. None of the messages mention Taylor or his arrest. None mention anything about planting a gun where Taylor might be found with it. No other witness tied Deputy Otwell to the relevant events. And the only dated messages between the deputy and Johnson are dated months after Taylor's arrest.

14

Finally, Taylor's and Cheatham's recorded testimony and statements support the State's case.

We therefore hold that excluding the messages at issue was harmless error.

Affirmed.

ABRAMSON and HIXSON, JJ., agree.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Pamela Rumpz*, Sr. Ass't Att'y Gen., for appellee.